# EXHIBIT A

9/23/2019 6:53 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 37052597
By: Nelson Cuero
Filed: 9/23/2019 4:20 PM

CAUSE NO. 201969148

| | | |
|---|---|---|
| RYAN BLOOMFIELD | § | |
| | § | |
| **Plaintiff** | § | |
| | § | IN THE 165th DISTRICT COURT |
| VS. | § | |
| | § | |
| | § | HARRIS COUNTY, TEXAS |
| KINGDOM OF SAUDI ARABIA and | § | |
| MOTIVA ENTERPRISES LLC | § | |
| | § | |
| **Defendants** | § | |

## ORIGINAL COMPLAINT

### TO THE HONORABLE COURT:

**COMES NOW**, RYAN BLOOMFIELD, Plaintiff, and files this Complaint for

multiple causes of action against Defendants KINGDOM OF SAUDI ARABIA and

MOTIVA ENTERPRISES LLC (hereinafter referred to as 'Saudi Arabia' and 'Motiva',

respectively). PLAINTIFF and would show this Court as follows:

### I. PARTIES

1.     The Plaintiff, RYAN BLOOMFIELD is currently a resident of Vista,

California and was a resident of Vista, California, at the time of the allegations giving

rise to this cause of action. Plaintiff is the only son and heir of GERALD BLOOMFIELD

II, a MAJOR in the UNITED STATES MARINE CORPS who was shot down while on

active duty in Ramadi, Iraq via a shoulder-launched surface-to-air (SAM) missile while

serving his country and conducting operations in support of the United States in 2005.

2.     Defendant, KINGDOM OF SAUDI ARABIA, is a country in Western

Asia that constitutes the bulk of the Arabian Peninsula. Saudi Arabia is geographically

1

the largest sovereign state in the Middle East, the fifth-largest in Asia, and the 12th-largest country in the world. The KINGDOM OF SAUDI ARABIA is a sovereign state and lawfully recognized government of the region. For many years, prior and post 9/11, Defendants were a significant source of funding for al Qaeda.

3. Defendant MOTIVA ENTERPRISES LLC is an alter ego of Defendant Kingdom of Saudi Arabia and conducts substantial business in the United States, specifically in Houston, Texas and Port Arthur, Texas as the owner of Motiva Enterprises and the Port Arthur Refinery that produces more than 600,000 barrels per day of refined petroleum products and is the largest refinery in the United States.

4. Although Saudi Arabia, Motiva, and Saudi Aramco have publicly discussed plans for an initial public offering (IPO) of Aramco, Defendant Motiva is currently completely owned, controlled, managed, monetized, and operated by the Kingdom of Saudi Arabia. By maintaining and operating the largest refinery in the United States, Defendants have availed themselves to the laws and jurisdiction of the United States and the State of Texas.

## II. JURISDICITION AND VENUE

5. Jurisdiction is proper in this court pursuant to the 2016 Justice Against Sponsors of Terrorism Act (JASTA), which Congress enacted over a Presidential veto to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, "to seek relief against. . . foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United

States ..." *see* 28 U.S.C. §2333. As a result, JASTA establishes U.S. court jurisdiction over the tortious acts of a foreign state anywhere in the world that causes injury and death against United States citizens.

6.      Plaintiff seeks such relief against the Defendants for the attributable acts of Saudi Arabian governmental Ministries and bodies, alter-egos, and officers, employees, and agents acting within the scope of their office, employment or agency by knowingly providing material support and resources to the al Qaeda terrorist organization and facilitating continued attacks against American Forces in Iraq.

7.      As set forth in detail herewith, Defendants:

   a.    raised, laundered and paid substantial financial support to al Qaeda
         to fund its budget and terrorist activities, including the preparation
         and execution of the September 11th attacks and the destabilization
         and terrorist activities of al Qaeda in Iraq after the 2003 U.S.
         invasion of Iraq;

   b.    supported terrorist and destabilization efforts in the Sunni Triangle,
         in order to establish a power base for Sunni Muslim operations
         and ideology and provide increased Sunni presence and influence
         in the country of Iraq;

   c.    funded terrorist training camps in Afghanistan where al Qaeda
         indoctrinated and taught terrorist fighters tactics, warfighting,
         guerilla warfare, and destabilization techniques to be used in Iraq;

   d.    provided critical logistical support and resources to al Qaeda
         around the world, funding safe houses, furnishing false passport
         and travel documents, transferring al Qaeda money, weapons and

3

equipment across international borders and other assistance, all of which enabled al Qaeda to conduct the September 11th Attacks and conduct destabilization activities in Iraq, after the 2003 U.S. invasion of Iraq;

e.   actively supported al Qaeda in the destabilization of Iraq through a network of the Kingdom's officers, employees and/or agents who met with and aided al Qaeda operatives, providing them with money, cover, advice, contacts, transportation, smuggling routes, military training manuals and other material support and resources.

8.     The defendant Kingdom of Saudi Arabia is a foreign state within the meaning of 28 U.S.C. § 1603(a), and 'Saudi Arabia' as used refers to the Kingdom of Saudi Arabia, its government Ministries and other bodies (including but not limited to its Ministry of Islamic Affairs, Ministry of the Interior, Ministry of Foreign Affairs and Embassies throughout the world), its alter-egos, and its officials, employees, or agents not only in the United States but throughout the world, while acting within the scope of their office, employment, or agency.

9.     Although the Defendant Kingdom of Saudi Arabia is subject to jurisdiction pursuant to 28 U.S.C. §1330 and JASTA' s 28 U.S.C. §1605B, there is no Federal tort for wrongful death. Rather, any wrongful death claims must be pursued in State Court as a wrongful death claim is a State law claim.

10.     Defendants Saudi Arabia and Motiva Enterprises LLC have availed themselves to the laws of the State of Texas by maintaining a substantial presence in Texas through Defendants' refinery operations in Texas. Defendant Motiva is based in Houston, Texas and operates the Port Arthur refinery, which is the largest refinery in the

4

United States and has annual revenue of over $24 Billion dollars. Defendants' refinery operations in Texas avail the Defendants to jurisdiction in Texas courts.

11.     This action seeks money damages against Defendants for injury and death caused by the Defendants' support of al Qaeda in Iraq in 2005, that was utilized by Defendants to increase Sunni Muslim influence in Iraq and decrease the emerging political hegemony of a new secular government in Iraq supported by the United States.

12.     Defendants Saudi Arabia and Motiva are also subject to jurisdiction pursuant to 28 U.S.C. §1330 and 28 U.S.C. §1605(a)(5), in that, as set forth in detail below, this action seeks money damages against Defendants for injury and death occurring to a United States citizen in Iraq and caused by the tortious act or omission of the Kingdom of Saudi Arabia and/or one or more of its officials or employees acting within the scope of their office or employment.

13.     Venue in this District Court is proper under Texas Civil Practice & Remedies Code §15.002 (a)(3) as Defendants carry out a substantial portion of their business in Houston, Texas and Port Arthur, Texas and have availed themselves to the laws of Texas by operating the largest petroleum refinery in the United States *in situ* in Port Arthur, Texas.

## III. EXHAUSTION OF ADMINISTRATIVE PROCEDURES

14.     All other conditions precedent have been performed or have occurred.

## IV. JURY DEMAND

15.     Plaintiff demands a jury trial on all issues so triable.

5

## V. STATEMENT OF THE CASE

16.     This chain of events began in the late 1990s with the Defendants' support,

organization, and funding of al Qaeda and Wahhabism in the Saudi Arabian peninsula

and Middle East. Wahhabism is an ultra-conservative and strict sect of Sunni Islam

(followers consider themselves the true Sunnis) that is espoused as the official State

religion by the Kingdom of Saudi Arabia. Al Qaeda (the base or database) was organized

as a militant arm and military force to support the goals of Sunni Islamists including: 1)

decreasing the influence of the United States in the region, 2) implementing Sharia law,

and 3) establishing a new caliphate and power structure free from Western involvement,

influence, or manipulation.

17.     Thus, scholars have identified the goals of al Qaeda:

      A.     Provoke the United States and the West into invading a Muslim

           country by staging a massive attack or string of attacks on U.S.

           soil that results in massive civilian casualties;

      B.     Incite local resistance to occupying forces;

      C.     Expand the conflict to neighboring countries, and engage the U.S.

           and its allies in a long war of attrition;

      D.     Convert al-Qaeda into an ideology and set of operating principles

           that can be loosely franchised in other countries without requiring

           direct command and control, and via these franchises incite attacks

           against the U.S. and countries allied with the U.S. until they

           withdraw from the conflict, as happened with the 2004 Madrid

           train bombings, but which did not have the same effect with the

           July 7, 2005 London bombings; and

E. Cause the U.S. economy to collapse by the year 2020, under the strain of multiple engagements in numerous places. This will lead to a collapse in the worldwide economic system, and lead to global political instability. This will lead to a global jihad led by al-Qaeda, and a Wahhabi Caliphate will then be installed across the world. *See* Atwan, Abdel Bari (March 11, 2005). *The Secret History of Al Qaeda.* University of California Press. p. 221.

18.     In the 1990s, Defendants considered al Qaeda an ally and proxy force, because in the Middle East, larger countries equip, train, and use proxy forces to conduct military operations and achieve policy goals, without direct links to the parent countries.

19.     Examples of countries' use of proxy forces include Iran's use of Hezbollah as a proxy force to attack Israel and Pakistan's use of Islamic militants to conduct raids and attacks in India.

20.     In the late 1990s, Defendants Kingdom of Saudi Arabia and Motiva Enterprises LLC began to fund, train, organize, and support al Qaeda as a proxy force to meet the Kingdom's policy goals: increase the influence of Saudi Arabia in the region, increase the spread of Wahhabism and Sunni beliefs, and decrease the influence of the United States in the region.

21.     Specifically, Defendants:

A. Raised, laundered and paid substantial financial support to al Qaeda to fund its budget and terrorist activities, including the preparation and execution of the September 11th Attacks;

7

B. Funded the terrorist training camps in Afghanistan where al Qaeda indoctrinated and taught their hijackers the skills they used to carry out the September 11th Attacks;

C. Provided critical logistical support and resources to al Qaeda around the world, funding safe houses, furnishing false passport and travel documents, transferring al Qaeda money, weapons and equipment across international borders and other assistance, all of which enabled al Qaeda to conduct the September 11th Attacks; and

D. Actively supported al Qaeda in its final preparations for the September 11th Attacks through a network of the Kingdom's officers, employees and/or agents who met with and aided the hijackers, providing them with money, cover, advice, contacts, transportation, assistance with language and U.S. culture, identification, access to pilot training and other material support and resources.

22. The Defendants support of al Qaeda did not end after the September 11th Attacks. In fact, Defendants continued to support al Qaeda with money transfers, communication, logistical support, intelligence gathering, weapons smuggling, and other assistance after the attacks and the U.S. led invasion of Iraq in 2003.

23. The Defendants continued to utilize al Qaeda as a proxy force and means to influence the new nation of Iraq, decrease the power of the Coalition Provisional Authority in Iraq established by the United States, and decrease the power of Shia-dominated groups (led by Iran) in the region.

8

24. One of the terrorists used by Defendants to further their policy goals was Ahmad Fadeel al-Nazal al-Khalayleh. Al-Khalayleh is more widely known by his *nom de guerre,* Abu Musab al-Zarqawi.

## VI. HISTORY OF SAUDI ARABIAN SUPPORT FOR AL QAEDA

25. For years prior to and on September 11, 2001, Saudi Arabia established, owned, operated and controlled a series of state-run "charity" organizations, namely:

- the Muslim World League (MWL),
- the International Islamic Relief Organization (IIRO),
- the Rabita Trust,
- the World Assembly of Muslim Youth (WAMY),
- the Benevolence International Foundation (BIF),
- the al Haramain Islamic Foundation (AHIF),
- the Saudi High Commission for Relief of Bosnia and Herzegovina (SHC),
- the Saudi Joint Relief Committee for Kosovo and Albania (SJRC), and
- the Saudi Red Crescent (SRC)

26. These organizations are referred to hereinafter as "Saudi Arabia's charity organizations" and as further described herein, each of these organizations (i) were so closely related to Saudi Arabia that they must be considered as part of Saudi Arabia, and/or (ii) were government agents of Saudi Arabia and/or (iii) were alter-egos of Saudi Arabia, because Saudi Arabia: established, controlled, operated and regulated each organization through its King, Council of Ministers, the Supreme Council of Islamic

9

Affairs, the Council of Senior Ulema, Ministry of Islamic Affairs, Ministry of Foreign Affairs, other Ministries and bodies and Saudi Arabia's Embassies throughout the world; maintained significant, repeated and extensive control of the day-to-day operations of each organization; provided each organization with virtually all of its funding and determined how funds were distributed; established guidelines, plans and policies that each organization was required to follow; appointed Saudi Arabia officials and employees to the lead positions within each organization; staffed each organization with Saudi Arabia's officials and employees; hired, fired and directed each organization's officers and employees; required each organization to obtain its approval for ordinary business decisions, including purchases, the locations of its operations and offices, banking, budgeting and grant decisions; used each organization's personnel and property as its own; ignored the separate legal status, if any, of each.

27.     During the decade prior to and including September 11, 2001, Saudi Arabia was responsible for substantial funding of al Qaeda that was vital to the operation of that terrorist organization and its preparations for and realization of the September 11th Attacks, including but not limited to the following:

      a.     Saudi Arabia's MWL, IIRO, Rabita Trust, WAMY, BIF, AHIF, SJC, SHC and SRC made substantial financial contributions to al Qaeda, as confirmed by U.S., French, German, Swiss, and Saudi Arabia government reports, United Nations reports, the statement of al Qaeda's Zacarias Moussaoui and other sources;

      b.     top ranking Saudi Arabia officials made substantial financial contributions to al Qaeda;

10

c.   from 1995 through and including September 11, 2001, Saudi
     Arabia, acting through its employees and agents, including Khalid
     al Suwailem, a diplomat and senior official of the Ministry of
     Islamic Affairs at the Saudi Arabia Embassy in Washington , D.C.
     and Omar Abdi Mohamed, employed by Saudi Arabia's Ministry
     of Islamic Affairs with the job title of "Propagator", fraudulently
     sought and obtained a visa for Mohamed to enter the United States
     as a "religious worker" and intentionally disguised the fact that
     Mohamed was a Saudi Arabia employee; had Mohamed form and
     operate the Western Somali Relief Agency (WSRA), a California
     non-profit corporation in San Diego, California; and, used WSRA
     in a scheme to send substantial funds to al Qaeda;

d.   from 1998 through and including September 11, 2001, Saudi
     Arabia, acting through its aforesaid employees and agents of Saudi
     Arabia's Ministry of Islamic Affairs:

     (i)    fraudulently obtained and/or maintained 26 U.S.C. §501(c)
            (3) charitable status for WSRA from the Internal Revenue
            Service, despite the fact that WSRA never performed any
            charitable acts;

     (ii)   used WSRA to receive money from various sources
            affiliated with al Qaeda, including but not limited to the
            AHIF; and

     (iii)  had WSRA send over $350,000 to al Qaeda via Dahab Shil,
            a money transfer agency used by al Qaeda, including but

11

not limited to the Dahab Shil office in Karachi, Pakistan, which was founded, staffed and controlled by al Qaeda;

e.   during the same time period that Saudi Arabia's employees and agents sent over $350,000 via WSRA to al Qaeda, including through the Dahab Shil office in Karachi, Pakistan, Khalid Sheikh Mohamed, the mastermind of the September 11th attacks, was located in Karachi and was handing and sending a total of approximately $400,000 in cash to the hijackers which constituted the primary funding for the September 11th Attacks;

f.   from 1998 through and including September 11, 2001, Saudi Arabia, acting through its employees and agents, including but not limited to Fahad al Thumairy, funded al Qaeda by sending substantial sums of money from Saudi Arabia through the King Fahad Mosque, also known as the Ibn Tamiyah Mosque, in Culver City, California, to al Qaeda, or through various organizations, individuals and/or private businesses, including but not limited to charities and/or other businesses, to al Qaeda;

g.   from 1998 through and including September 11, 2001, Fahad al Thumairy:

(i)   was an accredited diplomat working at Saudi Arabia's Los Angeles Consulate for Saudi Arabia's Ministry of Islamic Affairs;

(ii)   reported to more senior officials of Saudi Arabia's Ministry of Islamic Affairs at Saudi Arabia's Embassy in

12

Washington, D.C.;

(iii) had been selected for his job in Los Angeles by Saudi
Arabia's Head of Islamic Affairs in Washington, D.C.; and

(iv) was an extremist Iman at the King Fahad Mosque, which
was founded and funded by Saudi Arabia;

h. from 1998 through and including September 11, 2001, Saudi
Arabia funded al Qaeda by sending substantial sums of money
through the Islamic Center of San Diego, or through various
organizations, individuals and/or private businesses, including but
not limited to U.S.-based Somali charities and/or other businesses,
to al Qaeda;

i. Saudi Arabia hired and paid employees and agents, including
Omar al-Bayoumi and Osama Basnan, who Saudi Arabia knew
were al Qaeda operatives and/or sympathizers and who provided al
Qaeda with substantial assistance to prepare for the September
11th Attacks;

j. Bayoumi was employed by Saudi Arabia from the 1970s, and
starting in 1995 through and including September 11, 2001, he was
assigned by Saudi Arabia to work in San Diego and was
compensated by Saudi Arabia through various "ghost jobs" that
Bayoumi never actually performed;

k. in 2000, Bayoumi had a ghost job as a "Senior DSS Programmer"
and Saudi Arabia was paying him $3,000 per month when, as
detailed herein, he was instructed by two officials from Saudi

13

Arabia's Ministry of Islamic Affairs to provide substantial assistance for two al Qaeda hijackers in California, and Saudi Arabia paid Bayoumi an additional $4,000 per month, categorized as "Other Allowances" that was tied to his work to assist those hijackers and raised his total compensation to $7,000 per month from April 2000 through September 2001, after which that additional monthly payment ended and his compensation reverted to $3,000 per month;

l. Basnan, who also provided material support and services to the hijackers in California, as detailed herein, received approximately $75,000 in a series of transfers from the Riggs Bank account of the Saudi Arabia Embassy in Washington, D. C. from 1998 through September 2001, including $25,000 paid by the Embassy to Basnan and his wife in 1998 that was reimbursed to the Embassy by Yasin Kadi, a known al Qaeda financial operative, who wired the Embassy $25,000 in May 1998 from his Swiss bank account;

m. from the late 1990s through and including September 11, 2001, Ahmed al Dubayan and Mohamed Jaber Hassan Fakihi, working for Saudi Arabia's Ministry of Islamic Affairs in Germany and acting in the course and scope of their jobs for Saudi Arabia as Head of its Islamic Affairs Office at the Saudi Arabia Embassy in Bonn and/or Berlin, provided substantial funds of approximately $800,000 from the Saudi Embassy to support al Qaeda in Germany, including the al Nur Mosque in Berlin;

14

n.    in addition, Dubayan, Fakihi and the Ministry of Islamic Affairs
      arranged for the AHIF, with the approval and direct involvement
      of AHIF's General Director, Aqeel Abdulaziz al Aqeel, to provide
      funds in excess of $1,000,000 to support al Qaeda through the al
      Nur Mosque;

o.    the funds were paid by Saudi Arabia's Embassy and the AHIF to
      the al Nur Mosque at the specific instructions of al Qaeda
      operatives and Osama Bin Laden; that Mosque was frequented by
      members of the Hamburg al Qaeda cell led by Mohamed Atta that
      coordinated and carried out the September 11th Attacks; and, U.S.
      authorities concluded that Fakihi was more than a sympathizer of
      bin Laden and was "organizationally involved" with al Qaeda;

p.    from 1996 through and including September 11, 2001, Saudi
      Arabia funded al Qaeda's recruitment efforts in Germany by
      sending money to individuals, organizations and/or
      businesses there, including but not limited to al Qaeda financial
      operative Mamoun Darkazanli, Darkazanli Import Export and
      Abdelfatah Zammar, and those funds underwrote the recruitment
      by Mamoun Darkazanli, Abdelfatah Zammar and Mohamed
      Zammar at the al Quds Mosque in Hamburg, Germany of the
      Hamburg al Qaeda cell members that participated in the September
      11th Attacks, including hijackers Mohamed Atta, Ziad Jarrah and
      Marwan al Shehhi and other al Qaeda operatives who helped carry
      out the September 11th Attacks, including Ramzi bin al Shibh;

q.   starting in 2000 through and including September 11, 2001, AHIF
     collected over $1,000,000 for al Qaeda from donors in Saudi
     Arabia and instructed AHIF's employee and/or agent Abdulaziz
     Abdulralunan al Baddah to send those funds to al Qaeda via the
     Dahab Shil office in Karachi, Pakistan and Al Wafa Humanitarian
     Organization in Pakistan;

r.   from 1988 through and including September 11, 2001, senior
     managers of Saudi Arabia's IIRO, through its office in Pakistan,
     laundered and diverted IIRO funds to al Qaeda and used false
     distribution lists of orphan beneficiaries in Afghanistan as a
     subterfuge to direct funds to al Qaeda, as confirmed by Jamal al
     Fad, an al Qaeda defector, and senior officials at the headquarters
     offices of the MWL and IIRO were aware that IIRO funds were
     being diverted to al Qaeda in 1994, if not sooner, yet the practice
     continued;

s.   the IIRO's funding of al Qaeda was further confirmed by a 2001
     Ernst & Young accounting investigation, which reviewed IIRO
     records from 1996-2001 and detailed numerous serious
     discrepancies in IIRO's financial statements and accounts,
     including but not limited to that: over half of the funds transferred
     from IIRO 's headquarters could not be accounted for; over $3
     million of expenditures could not be explained; about $250,000
     purportedly spent on aid to Afghan orphans went missing;
     signatures on financial documents were faked or forged;

16

invoices for construction were falsified; and, funds were sent to

fictitious companies created by IIRO directors;

t.     from 1993 through 1998, Saudi Arabia's IIRO funded al Qaeda by

sending approximately $500,000 from the IIRO to the IIRO's

endowment arm, Sana-Bell, administered by the IIRO's Suliman al

Ali, for a purported real estate project in Fort Washington, MD,

managed by Soliman Biheiri, and all or the large majority of that

money, along with contributions made by Osama Bin Laden's

mother and sisters, Abdullah Bin Laden, Osama Bin Laden's

nephew, Yasin Kadi, an al Qaeda operative, and others, altogether

totaling approximately $2 million, went missing, and Biheiri's

accountant told the FBI that funds were transferred overseas to al

Qaeda, or through various organizations, individuals and/or private

businesses to al Qaeda, and Biheiri was tried in the Eastern District

of Virginia and convicted on federal charges for passport fraud and

making false official statements to obstruct a terrorism

investigation;

u.     from 2000 through and including September 11, 2001, Saudi

Arabia's WAMY funded al Qaeda by sending over $50,000 to

WAMY's account in Canada which was channeled through BIF's

orphan program in Afghanistan to al Qaeda, or through various

organizations, individuals and/or private businesses to al Qaeda,

and less than 25% of the funding for BIF's orphan program was

actually used for orphans;

17

v.    in 1996-1999, under the pretext of doing construction work in Bosnia, Saudi Arabia's SHC funneled hundreds of thousands of dollars to al Qaeda through companies established by al Qaeda operatives Wael Jelaidan, Yasin Kadi, and Shafiq Ayadi, who were later designated by the United States as Specially Designated Global Terrorists because of their activities to support al Qaeda for the decade prior to the September 11th Attacks;

w.    from 1998 through and including September 11, 2001, Saudi Arabia created the SJRC and appointed Wael Jelaidan, a Saudi Arabia employee since 1985 and former Director of the MWL, as its Executive Director, despite the fact that Saudi Arabia knew that Jelaidan was an active al Qaeda operative and one of the founders of al Qaeda;

x.    Jelaidan proceeded to use his position as SJRC Executive Director in Albania and Kosovo to provide financial and logistical support to al Qaeda through businesses in Albania that were owned and operated by:

    (i)    Yasin Kadi, a known al Qaeda financial operative,

    (ii)    Abdelatif Saleh, a known al Qaeda operative and financial supporter with ties to Osama Bin Laden, and

    (iii)    Jelaidan himself;

y.    in September 1999, Jelaidan was declared an "undesirable" by Albania and ordered to leave the country because of his links to a 1998 al Qaeda terrorist plot against the U.S.Embassy in Albania,

yet after his expulsion Saudi Arabia continued to retain Jelaidan as SJRC's Executive Director, and Jelaidan was invited to join top ranking Saudi Arabia officials on Saudi Arabia government business trips;

z.      in 1997-2000, Saudi Arabia's BIF sent approximately $80,000 to al Qaeda through a front company named Maram, in Istanbul, Turkey, ostensibly a trading company, that was founded, owned and run by al Qaeda, through its operatives Mahmdou Salim (also a BIF employee), Wael Jelaidan and Mohamed Bayazid (BIF's President);

aa.     in or around February 2000, Saudi Arabia's AHIF sent approximately $150,000 to al Qaeda through a money laundering scheme whereby funds were received by the AHIF in its U.S. bank account and then withdrawn from that account and illegally carried out of the U.S. in the form of cash and traveler's checks by Soliman al Buthe, a senior member of the Saudi government for the city of Riyadh, an AHIF officer and President of AHIF in the U.S., and then distributed through various channels to al Qaeda;

bb.     in the late 1980s, Saudi Arabia's MWL sent its employee and agent Mohamed Khalifa, Osama Bin Laden's brother-in-law, to found a MWL/IIRO office in the Philippines and thereafter in or around 1994, money from Saudi Arabia's IIRO through its Philippines office was used to fund an al Qaeda affiliated terrorist

19

cell headed by Ramzi Yousef, the 1993 World Trade Center bomber, to carry out terrorist attacks against the United States, including the 1995 Bojinka plot and its test run, the December 1994 Philippine Airlines bombing, which were forerunners of the September 11th Attacks;

cc.     following the September 11th Attacks, the United States formally declared in Exec. Order No. 13224 (as issued in 2001 and updated in 2001, 2002, 2004, 2006 and 2008) that all or portions of four of Saudi Arabia's charity organizations, namely the AHIF, IIRO, Rabita Trust and BIF, and numerous employees of Saudi Arabia's charity organizations, including Wael Jelaidan (MWL, IIRO, SRC, SJRC, Rabita Trust), Abdelhamid al Mujil (IIRO), Soliman al Buthe (AHIF), Aqeel al Aqeel (AHIF), Adel Batterjee (WAMY, BIF), Enaam Amaout (MWL, WAMY, BIF) were Specially Designated Global Terrorists, based on the material support and resources they provided to al Qaeda prior to the September 11th Attacks

## VII. ABU MUSAB AL-ZARQAWI AND MAJOR BLOOMFIELD'S DEATH

28.     Al-Zarqawi was a Jordanian jihadist who ran a terrorist training camp in Afghanistan. He became known after going to Iraq in 2002 and organizing a series of bombings, beheadings, and attacks during the Iraq War, turning an insurgency against U.S. troops in Iraq into a Shia-Sunni civil war. He was also known as 'Sheikh of the

Slaughterers'. *See* Weiss, Michael; Hassan, Hassan (2015). "Sheikh of the Slaughterers". ISIS: Inside the Army of Terror. Simon and Schuster.

29. Al-Zarqawi formed al-Tawhid wal-Jihad in the 1990s, and led it until his death in June 2006. Zarqawi took responsibility, on several audio and video recordings, for numerous acts of violence in Iraq including suicide bombings and hostage executions. Zarqawi opposed the presence of U.S. and Western military forces in the Islamic world, as well as the West's support for the existence of Israel.

30. In late 2004, Al-Zarqawi joined al-Qaeda, and pledged allegiance to Osama bin Laden. After this, al-Tawhid wal-Jihad became known as Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn, also known as al-Qaeda in Iraq (AQI), and al-Zarqawi was given the al-Qaeda title "Emir of Al Qaeda in the Country of Two Rivers" *See* Chehab, Zaki 2006, Iraq Ablaze: Inside the Insurgency, IB Tauris & Co, Cornwall, p. 8.

31. In September 2005, Al-Zarqawi declared "all-out war" on Shi'ites in Iraq, after the Iraqi government offensive on insurgents in the Sunni town of Tal Afar. Al-Zarqawi dispatched numerous suicide bombers throughout Iraq to attack American soldiers and areas with large concentrations of Shia militias. He was also responsible for the 2005 bombing of three hotels in Amman, Jordan. See *Amman Bombings Reflect Zarqawi's Growing Reach* By Craig Whitlock, The Washington Post, November 13, 2005.



**Fig. 1 – Terrorist Mastermind** and Recipient of Defendant's Funding to Conduct
Operations in post-war Iraq, Abu Musab Al-Zarqawi

32.      Zarqawi was killed in a targeted strike by a joint U.S. force on June 7,

2006, while attending a meeting in an isolated safehouse in Hibhib, a small village

approximately 8 km (5.0 mi) west-northwest of Baqubah.

33.      A year before his death, Zarqawi began to obtain funds from Defendants

and through Defendants' ties to al Qaeda, in order to purchase advanced weaponry

capable of shooting down U.S. helicopters flying in Iraq. Helicopters were seen as an

important tool (used by the Americans) as these military helicopters could quickly deliver

22

supplies, strike teams, ammunition, advisors, materiel, warfighters, and gather intelligence to stabilize Iraq and support the Coalition-led Provisional Authority in Iraq.

34.     Through funding provided by Defendants, Zarqawi had access to large bank accounts and the capability to buy and smuggle into Iraq light, shoulder-launched, surface-to-air (SAM) missiles not used by the new Iraqi army.

35.     Zarqawi began to purchase these weapons, including the Russian-made SA-7 Grail ('Arrow' in Russian, also known as the 9K32 Strela-2) to shoot down U.S. helicopters. In fact, al Qaeda produced an hour-long training video on how to operate and fire the SA-7. *See Terrorists known to possess SAMs.* CNN. 2002-11-28. Archived from the original on 2011-03-22.



Source: DOD.

From left to right: (A) battery, (B) gripstock, (C) launch tube, and (D) missile.

**Fig. 2 – SA-7** Grail Surface-to-Air (SAM) Missile



**Fig. 3 – Components** of the SA-7 Grail

36.     Due to previous U.S. operations that destroyed Iraqi arms depots, Zarqawi

needed to obtain newer SA-7 missiles from neighboring countries. The SA-7s used by

Zarqawi's cell were purchased using funds provided by the Defendants and then

smuggled into Iraq.

37.     On November 2, 2005, one of Zarqawi's terror cells used a freshly-

acquired SA-7 Grail and shot down a Marine AH-1W Cobra helicopter piloted by Gerald

Bloomfield II, an active-duty Major in the United States Marine Corps. After the missile

strike, Maj Bloomfield lost control of the helicopter. The explosion damaged the tail rotor

and caused the rapid descent and fiery crash of the aircraft.



**Fig. 4- MAJOR GERALD BLOOMFIELD II**, killed in Ramadi, Iraq on
November 2, 2005 due to the actions of the Defendants

38.     Major Bloomfield was a patriot, husband, father, engineer and pilot. He
graduated with a degree in Physics and Mathematics from Eastern Michigan State. After
joining the Marines, Major Bloomfield underwent pilot training and obtained a highly-
coveted spot as a pilot of an AH-1W Cobra helicopter. Bloomfield then graduated from
the Naval Postgraduate School in Monterrey, California with a Masters in Electrical
Engineering. He served at the Marine Corps Tactical Systems Support Activity, Marine
Corps Systems Command, before being assigned back to a helicopter squadron in 2003.

39.     On November 2, 2005, Major Bloomfield was alive for one minute as he
struggled to regain control of the helicopter. However, the aircraft was severely damaged
and Major Bloomfield could not gain control. Major Gerald Bloomfield and his gunner,
Captain Michael Martino, were killed when their AH-1W Cobra helicopter crashed into
the ground at a high rate of speed. Also killed in the crash was Army 2nd Lieutenant

25

Procopio, who was responding to the crash site and attempting to provide first aid to any

survivors.

40.     The official crash report cited the al Qaeda cell's use of the SA-7 Grail

missile as the cause of the crash and explosion of the aircraft that led to deaths of Major

Bloomfield, Captain Martino, and Lieutenant Procopio. The following is an account from

the unit's Commanding Officer, Lieutenant Colonel Thomas Weidley, USMC:

> "The Marines were flying a unit operation, consisting of a UH-1 Huey Gunship
> commanded by the Executive Officer (X.O.) of the squadron, Major Mike
> Martinez and co-piloted by 1st Lt Richard Witt, and an AH-1W Cobra Attack
> Helicopter (a two piloted aircraft) flown by Major Bloomfield and Captain
> Martino, who operated the weapons and sensors. The Huey was designated the
> 'dash one unit', and the Cobra was designated the 'dash two unit' of the missions
> Gunshot 65 (GT65) and Gunshot 66 (GT66) respectively.
>
> The two aircraft had been called in to provide support for a Marine Engineering
> Unit that was under attack by a large group of insurgents just outside of Al
> Ramadi, Iraq. Upon entering the area at about 2,500 feet, both helicopters came
> under intense fire. Maj. Martinez called for the units to do a butterfly break
> maneuver.
>
> This maneuver split the two units with the Huey breaking left the Cobra breaking
> right. It was at this point that the Cobra was painted by the missile and locked on.
> The missile was fired and at 0815, the subsequent explosion of the missile
> destroyed the tail section of the Cobra causing it to fall uncontrolled to the
> ground.
>
> The damage done was catastrophic with no chance of emergency landing. It was
> subsequently found that all of the anti-missile detection and protection systems on
> the Cobra were set and working at the time. There was no pilot error or equipment
> malfunction. After the crash, the Cobra was on fire, and the responding flight
> crew was not able to pull out the bodies of Major Bloomfield or Captain Martino
> from the burning wreckage.
>
> The crash site was in a suburban neighborhood with one and two-story houses. As
> soon as the insertion helicopters lifted off, insurgent machinegun fire and AK-47
> fire was encountered. The Marines from the responding reaction force established
> a perimeter in the house adjoining the wreckage. However, security at the
> wreckage could not be established due to the cooking off of 20mm cannon
> projectiles and missiles from the downed aircraft. The responding Marines who
> attempted to rescue any survivors were immediately engaged with small arms fire

26

and another surface-to-air missile (SAM) which the third and fourth helicopter violently maneuvered to avoid as it passed between the additional helicopters that responded to the crash site.

A reinforced armored platoon from the 3rd Battalion, 172nd Infantry Regiment, Vermont Army National Guard, commanded by 2nd Lieutenant Mark J. Procopio also responded to the Cobra helicopter crash site. However, in route to the crash, Lt. Procopio encountered heavily armed insurgents and small-arms fire that slowed down the rescue convoy. The insurgents then detonated an IED under Lt. Procopio's Humvee, killing Lt. Procopio instantly and stopping the rescue.

At 1100, the fire at the crash site was out and the burned bodies of Captain Michael Martino and Major Gerald Bloomfield were recovered."

41.     Shortly after Major Bloomfield's death, Abu Musab al-Zarqawi claimed

responsibility for the incident and acknowledged al Qaeda's role in the crash.



**Fig. 5 – Photo** of Major Gerald Bloomfield's Crash Site

Al-Zarqawi and al Qaeda said its military wing, "Downed a Super Cobra attack

helicopter in Ramadi with a Strella rocket, thanks be to God." The Associated Press also

27

reported that al Qaeda in Iraq claimed responsibility, noting that it shot down a U.S attack helicopter near Ramadi and killed two U.S. Marines on November 2, 2005. *See* Al-Qaida Says It Shot Down U.S. Helicopter, Killing Two, ASSOCIATED PRESS, November 4, 2005, https://www.dailynews.com/2005/11/04/al-qaida-says-it-shot-down-us-helicopter-killing-two (last visited Sep 19, 2019).

42.     Without Defendants' support, financing, and supervision of al Qaeda, Major Gerald Bloomfield and his weapons officer Captain Michael Martino, would not have been shot down and killed on November 2, 2005.

43.     Defendants have a long history of providing funding, intelligence, logistics, support, and transportation to al Qaeda. Defendants' actions and omissions were the proximate cause of the death of Major Gerald Bloomfield and give rise to this cause of action.

## VIII. RECENT DEVELOPMENTS PROVE SAUDI ARABIAN PLANNING AND FUNDING OF AL QAEDA LED TO MAJOR BLOOMFIELD'S DEATH

44.     Newly-released documents prove the Defendant's development and financing of al Qaeda led to the death of Major Gerald Bloomfield.

45.     On September 12, 2019, the U.S. Department of Justice and FBI announced they would finally declassify and release the name of the third Saudi Arabian official with ties to al Qaeda that led to the 9/11 attacks and follow-on attacks during the U.S. occupation and stability operations in Iraq.

46.     This person is the last of three main Saudi Arabian officials referred to in a classified FBI report into the attacks. This official assisted some of the attackers after they arrived in the U.S. The first two Saudi Arabian government officials that were

28

identified by the FBI and provided significant support to al Qaeda were Saudi Arabian
Intelligence Officers Fahad al-Thumairy and Omar al-Bayoumi.

47.     At all times, the three Saudi Arabian Intelligence Officers were working
under the direction of Defendant Kingdom of Saudi Arabia. The funds provided to these
Saudi Arabian Intelligence Officers were first generated through the sales of petroleum
products by Defendant Motiva and then funneled to al Qaeda terrorists operating in the
United States, Germany, and Iraq.

48.     Without the sponsorship and funding of the Defendants, al Qaeda
operatives in Iraq would not have had the money, time, materiel, methods, training, and
means to conduct terrorist attacks on Americans in Iraq. Furthermore, Major Gerald
Bloomfield would not have been shot down via a SA-7 Grail missile purchased and used
by al Qaeda in Iraq.

## IX. SAUDI ARABIAN INTELLIGENCE DOES CONDUCT MILITARY OPERATIONS OVERSEAS

49.     To dispel any doubt that Saudi Arabia conducts military operations outside
of the Kingdom, Plaintiff asks the Court to take judicial notice of the Jamal Khashoggi
incident as evidence that Saudi Arabia conducts military and intelligence operations
outside of the Arabian Peninsula.

50.     Jamal Khashoggi was a Saudi Arabian dissident, author, columnist for The
Washington Post, and a general manager and editor-in-chief of Al-Arab News Channel
who was assassinated at the Saudi consulate in Istanbul on October 2, 2018 by agents of
the Saudi government.

51.     Khashoggi was lured to the Saudi Arabian Consulate in Istanbul, Turkey on October 2, 2018 under the premise of obtaining a marriage visa. Before Khashoggi's scheduled appointment, the consulate was cleared of all personnel except for an assassination team flown in that morning from Saudi Arabia. Khashoggi entered the Saudi Consulate at 1:14 PM. Shortly thereafter, Khashoggi was strangled, killed, and dismembered. His remains were taken back to Saudi Arabia by the assassination team.

52.     Unbeknownst to Saudi Arabia, the consulate was wired with recording devices by the Government of Turkey. The assassination was recorded (voice only) and included Khashoggi's last words at 1:24 PM, "I can't breathe."

53.     The Saudi assassination team then drained Khashoggi's blood and dismembered his body. That afternoon, the assassination team left the consulate with two large black bags and flew via two private jets to Cairo and Dubai, and then both jets flew to Riyadh, Saudi Arabia. It is also believed that Khashoggi had details and information about the Saudi Arabian government's involvement in the 9/11 attacks and support of al Qaeda. Thus, Khashoggi was silenced so that he would not testify about nor corroborate the ties between Saudi Arabia and al Qaeda.



**Fig. 6 – Journalist** and Washington Post Writer Jamal Khashoggi, killed by Saudi Arabian Intelligence Officers in Turkey on October 2, 2018.

54.    The assassination of Jamal Khashoggi demonstrates a pattern, practice, habit, and custom of Defendant Kingdom of Saudi Arabia directing government agents to conduct operations overseas that result in death and injury.

## X. CAUSE OF ACTION

A.    **Plaintiff Ryan Bloomfield's Cause of Action for the Personal Injury and Wrongful Death of his father Gerald Bloomfield II, Against All Defendants Pursuant to Texas State Law**

55.     Plaintiff repeats and repleads all of the preceding paragraphs as if fully set forth herein. Plaintiff is the sole surviving heir and child of decedent Gerald Bloomfield, II.

56.     In Texas, a person (or corporation) is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's (or corporation's) or his agents' or servants':

    a)     wrongful act,

    b)     neglect,

    c)     carelessness,

    d)     unskillfulness,

    e)     or default.

57.     In the instant case, the Defendants' wrongful act, neglect, and/or carelessness in their support, funding, and assistance of al Qaeda was the proximate cause of Gerald Bloomfield II's death.

58.     Defendants have a long history of supporting al Qaeda and are also known for conducting military operations overseas to increase the Kingdom of Saudi Arabia's geopolitical influence.

59.     U.S. Intelligence sources have repeatedly linked high-level Saudi Arabian government officials to the support, funding, and operations of al Qaeda to carry out the 9/11 attacks and conduct military operations in U.S.-occupied Iraq, after the 2003 invasion of Iraq.

60.     For years prior to and after September 11, 2001, Saudi Arabia participated and associated with al Qaeda in its terrorist agenda as set forth herein; provided al Qaeda and its hijackers with substantial material support, financing and resources; knew that it

32

was assisting a terrorist organization that had conducted and was actively planning attacks against the United States and U.S. interests; and committed tortious acts and omissions that were wrongful, neglectful, and careless.

61.     Defendants' conduct was a proximate cause of the death of Major Gerald Bloomfield II, and the resulting damages suffered by Plaintiff, as Defendants furnished the essential support networks, cover, and funding used by al Qaeda to successfully plan and execute attacks against the United States.

62.     Saudi Arabia tortiously aided and abetted al Qaeda by providing substantial assistance in the form of funding, support and resources to al Qaeda with the knowledge that al Qaeda planned to use such assistance to prepare for and conduct terrorist attacks against the United States and its citizens, both at-home and abroad, and with the carelessness of the known probable risk that such assistance would be used for those terrorist purposes.

63.     Saudi Arabia tortiously conspired with al Qaeda and others to provide al Qaeda with substantial material support and resources, with the shared agreement, understanding, knowledge and intent that said support and resources would be used by al Qaeda to plan and carry out terrorist acts against the United States and U.S. Citizens.

64.     For years prior to, including, and after September 11, 2001, Saudi Arabia knew that its officers, employees and agents and Saudi Arabia's charitable organizations were engaging in illegal and/or criminal activity by using Saudi Arabia's offices, equipment and other resources to provide substantial material support and resources to al Qaeda and, that Saudi Arabia's officers, employees and agents, including but not limited to Adel Batterjee , Wael Jelaidan Soliman al Buthe, Aqeel al Aqeel, Abdelhamid al Mujil, Enaam Arnaout, Fahad al Thumairy, Omar al Bayoumi, Omar Abdi Mohamed,

33

Osama Basnan, Hamdan Shalawi, Mohamed al Qudhaieen, Mohamed al Fakihi, and others were al Qaeda operatives or sympathizers who were using their government positions in Saudi Arabia to provide substantial assistance to al Qaeda.

65. Despite such knowledge, Saudi Arabia intentionally and/or recklessly failed to properly supervise its officers, employees and agents and Saudi Arabia's charitable organizations to stop them from using Saudi Arabia's offices, equipment and other resources to provide substantial assistance to al Qaeda despite the known and/or foreseeable risk that such assistance was being used by al Qaeda to prepare and conduct a terrorist attack against the United States and its citizens.

66. Moreover, Saudi Arabia intentionally and/or recklessly selected, hired and retained as its officers, employees and agents various individuals, including Adel Batterjee, Wael Jelaidan, Soliman al Buthe, Aqeel al Aqeel, Abdelhamid al Mujil, Enaam Amaout, Fahad al Thumairy, Omar al Bayoumi, Omar Abdi Mohamed, Osama Basnan, Hamdan Shalawi, Mohamed Qudhaieen, Mohamed Fakihi and others, who Saudi Arabia knew were al Qaeda operatives or sympathizers, despite the known and/or foreseeable risk that those employees and agents would use and/or were using their government positions to provide substantial assistance to al Qaeda to prepare and conduct attacks against the United States and its citizens.

67. Saudi Arabia wrongfully, neglectfully, and/or carelessly supported and funded the efforts of Abu Musab al Zarqawi (after the U.S.-led invasion of Iraq), to destabilize Iraq, attack U.S. forces in Iraq, and increase Defendants' geopolitical influence and Sunni Muslim ideology in Iraq and the Arabian peninsula.

68. The aforesaid wrongful acts, neglectful acts, and/or careless acts of Saudi Arabia and Motiva Enterprises LLC were individually and/or in combination with one or

34

more of those acts and/or omissions a proximate, substantial cause of the death of the decedent and Plaintiff's damages.

## XI. PRAYER

As a proximate cause of the foregoing, Plaintiff has suffered damages and seeks the following relief from the Defendants:

    a.    A declaration that the acts and practices noted in this Complaint are a violation of the Texas Wrongful Death Act, TCPRC Title 4 §71.002(b);

    b.    Compensatory damages including, but not limited to:

        i.    Loss of earnings and earning capacity;

        ii.    Past, current, and future emotional pain and mental anguish;

        iii.    Loss of companionship, society, comfort, and love;

        iv.    Past and future medical expenses; and

        v.    Loss of an inheritance

    c.    Exemplary damages;

    d.    Awarding Plaintiff such other relief, legal or equitable, as may be warranted;

    e.    Plaintiff further seeks pre- and post-judgment interest, costs of court, attorney's fees as recoverable and litigation expenses for trial and appeal;

    f.    An Order directing Defendants to pay Plaintiff's exemplary/ punitive damages for their conduct in an amount as yet to be ascertained;

**WHEREFORE**, Plaintiff requests that upon trial of this cause, that Plaintiff

obtain a judgment as authorized by law, and any other relief that Plaintiff may be entitled

to.

DATE: SEPTEMBER 23, 2019        Respectfully submitted,

           By:     /s/ Omar W. Rosales
                 Omar W. Rosales
                 Texas Bar No. 24053450

                 THE ROSALES LAW FIRM, LLC
                 14846 S VALENCIA
                 HARLINGEN, TX 78552
                 TEL (512) 520-4919
                 FAX (512) 309-5360
                 omar@owrosales.com

                 ATTORNEY FOR PLAINTIFF